**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF NEW YORK**

---

CORY HAMMOCK,  ANGELA BYNUM, and
ANGIOLINA ULERIO-URBAEZ,

*Plaintiff,*

v.

MOVING STATE TO STATE LLC, STATE TO
STATE MOVING NY INC, STATE TO STATE
MOVING GROUP LLC, DIRECT VAN LINES
SERVICES INC., AROUND THE CLOCK
MOVING SERVICES INC., GREEN PEACE
TRANSPORTATION LLC, YARIN NADEL, and
MICHAEL NADEL and UNKNOWNS 1-100,

*Defendants.*

**18 Civ. 05628 (SJ) (ST)**

**FOURTH AMENDED**
**COMPLAINT**

---

1.     By and through their attorneys, Jones Law Firm, P.C., Plaintiffs Cory Hammock

("Hammock"), Angela Bynum ("Bynum") and Angiolina Ulerio-Urbaez ("Ulerio-Urbaez") allege

as follows:

## PRELIMINARY STATEMENT

2.     This is a class action for violations of the Racketeer Influenced and Corrupt

Organization Act ("RICO"), 18 U.S.C. §§ 1961-1968, deceptive business practices in violation of

N.Y. Gen. Bus. Law § 349 *et seq.*, fraudulent conveyance, fraud, negligent misrepresentation, and

conversion under New York law.

3.     Named Defendants include Michael Nadel and his son Yarin Nadel (the "Nadels"

or "Individual Defendants") and six business entities owned and operated by the Nadels: (1)

Moving State to State LLC ("STS"), (2) State to State Moving NY Inc., (3) State to State Moving

Group LLC, (4) Direct Van Lines Services, Inc. (5) Around the Clock Moving Services Inc. and

(6) Green Peace Transportation LLC (collectively referred to as the "State to State Companies" or "Corporate Defendants") and unknown individual people and business entities numbered 1 through 100.

4.      On June 24, 2021, the Individual Defendants plead guilty to Count VI of a Criminal Indictment filed by the United States in this District. Minute Entry, Dkt. No. 46, *United States v. Nadel*, No. 19 Cr. 00493 (E.D.N.Y.) (Vitaliano, *J.*) attached as Exhibit A.

5.      Michael Nadel and Yarin Nadel pled guilty to the government's allegation that they, "together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud customers and potential customers of the State to State Companies, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing said scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate commerce . . . contrary to Title 18, United States Code, Section 1343." Dkt. No. 1 at 12 ("Count Six"), *United States v. Nadel*, No. 19 Cr. 00493 (E.D.N.Y.) (Vitaliano, *J.*) attached as Exhibit B.

6.      Through this scheme to defraud customers and potential customers, Michael Nadel and Yarin Nadel, together with others including the Corporate Defendants, marketed their services on the internet as interstate moving brokers and/or carriers.

7.      When potential customers contacted the defendants through email or the telephone, the defendants made fraudulent statements on email or telephone, or both, that were designed to induce them to retain the Corporate Defendants' interstate services and to give money and property to them.

8.      Later, after receiving the victims' property, the defendants made further misrepresentations to secure additional monies from the victims.

2

9.      If the victims refused to pay additional money (often upwards of 10% of the original estimate), the defendants placed the victims' property into storage and refused to deliver the property until they received the additional payments.

10.     If the victims continued to refuse to make the additional payments, these defendants threatened to sell or auction off the victims' property.

11.     Defendants conducted this fraudulent scheme by engaging with victims using interstate wires (including the use of the electronic mail, telephones, and internet) to transmit fraudulent representations to obtain money and property from their victims, including the plaintiff in this case, in interstate commerce.

12.     Plaintiffs seek redress for the harm done to them as well as the class of victims harmed by defendants' fraudulent scheme.

## JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the laws of the United States, and 18 U.S.C. § 1964(c) because Plaintiff asserts claims for violations of the Racketeer Influenced and Corrupt Organizations Act, 28 U.S.C. §§ 1961-1968.

14.     The Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367 because those claims are substantially related to Plaintiff's federal claims.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because, at all relevant times, Defendants resided in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

**PARTIES**

16.     Plaintiff Cory Hammock is a resident of St. George, Utah.

17.     Plaintiff Angela Bynum is a resident of Lawrence, Massachusetts.

18.     Plaintiff Angiolina Ulerio-Urbaez is a resident of Norfolk, Virginia.

19.     At all relevant times, Defendant Michael Nadel was a resident of Queens, New York, and was an owner, officer and operator of the State to State Companies.

20.     Defendant Michael Nadel did business as, is also known as, and holds himself out as Michael Miller or Mickey Miller.

21.     At all relevant times, Defendant Yarin Nadel (the son of Defendant Michael Nadel) was a resident of Queens, New York, and was an owner, officer and operator of the State to State Companies.

22.     Yarin Nadel did business as, is also known as, and holds himself out as Joe Nadel, or New York Joe.

23.     Defendant Moving State to State LLC is a New York limited liability company that maintained a principal place of business in Queens, New York.

24.     Defendant State to State Moving NY Inc. is a New York corporation that maintained a principal place of business in Queens, New York.

25.     Defendant State to State Moving Group LLC is a New York limited liability company that maintained a principal place of business in Queens, New York.

26.     Defendant Direct Van Lines Services, Inc. is a New York corporation that maintained a principal place of business in Queens, New York.

27.     Defendant Around the Clock Moving Services Inc. is a New York corporation that maintained a principal place of business in Queens, New York.

28.     Defendant Green Peace Transportation LLC is a Pennsylvania limited liability company that maintained a reported principal place of business in Levittown, Pennsylvania.

29.     Michael Nadel and Yarin Nadel operated the State to State Companies out of offices located in Fresh Meadows, a neighborhood in the northeastern section of the New York City borough of Queens.

30.     Defendants Unknown 1-100 are natural people or business entities who are currently unknown and participated in the fraudulent scheme, as admitted to on June 24, 2021, by the Individual Defendants when they plead guilty to Count VI of a Criminal Indictment filed by the United States in this District.

## DEFENDANTS' FRAUDULENT SCHEME

31.     Defendants advertised interstate moving services on the internet.

32.     As a part of the scheme, Michael Nadel and Yurin Nadel, together with others, registered business entities (corporations and limited liability companies), including but not limited to the State to State Companies, often using fictitious names and business addresses, which the defendants, together with others, owned, operated and controlled, and used for their interstate moving business.

33.     When people contacted defendants through the internet, or by electronic mail or telephone, or some combination thereof, defendants provided bids to move the individuals' personal property.

34.     During communications with potential customers over interstate wires, the defendants made a series of material misrepresentations designed to induce the potential customers to retain defendants.

35.     Among other things, the defendants, together with others, over the internet, email and telephone (i) quoted estimated charges for their moving services that they had no intention of

honoring; (ii) misrepresented the number, ownership and United States Department of Transportation ("USDOT") registration of the trucks to be used to transport customers' goods; (iii) misrepresented the number of movers who would transport the customers' goods; and (iv) misrepresented various quality control measures that would be used in transporting the customers' goods.

36.     After the customers retained defendants to provide the moving services, the defendants would schedule a pickup date for the defendants' agents to arrive, pack up the victims' belongings, and place them into a moving truck or van.

37.     But, after all the customers' belongings were loaded into the moving truck or van, the defendants demanded additional sums (often more than 10 percent of the original estimate) to be paid by cash, postal money order or credit card.

38.     If the victims refused to pay the additional amounts, instead of delivering the belongings as promised, the defendants placed the items in storage until the victims paid the marked-up prices.

39.     If the victims still refused to pay the additional sums, the defendants threatened to sell or auction the items.

40.     The victims were forced into a scenario of either paying the extortionate additional fees, being deprived of their property for months, or even potentially permanently losing their personal property.

41.     Thus, Defendants Michael Nadel and Yarin Nadel, together with other unknown people, agreed to defraud customers and potential customers of the State to State Companies or other business entities, by misrepresenting the estimated charges for their moving services on interstate wires (including the use of the internet, electronic mail, and telephones and then

requiring customers to pay additional fees by refusing to return, and threatening to sell and auction, the customers' belongings if these unlawful fees were not paid.

## ABUSE OF THE CORPORATE FORM

42.     At all relevant times, Michael Nadel and Yarin Nadel, as well as other unknown individuals, exercised complete domination of the six business entities named as defendants, as well as unnamed business entities used in the scheme, and used such domination to commit fraud, acts of inequity or malfeasance against plaintiffs that resulted in injury as well as the class of plaintiff which resulted in injury.

43.     At all relevant times, the State to State Companies, and other unnamed business entities, were "dummies" for the Individual Defendants who owned them, who were, in reality carrying on the business in their personal capacities for purely personal reasons.

44.     The Individual Defendants, as well as unknown individuals, are alter egos of the State to State Companies, and therefore should be held jointly and severally liable for any relief or damages awarded to the Plaintiff when judgment is entered against those corporate defendants.

45.     The State to State Companies and other unnamed business entities were so dominated by the Individual Defendants, together with others, and their separate entity status so ignored that they could be called alter egos of each other and the individual defendants, that the corporate form may be disregarded to achieve an equitable result.

46.     As a part of their scheme, the Individual Defendants, together with others, registered corporate entities, including but not limited to the State to State Companies, often using fictitious names and business addresses, which the defendants, together with others, owned, operated and controlled, and used for their interstate moving business.

47.     On information and belief, the Individual Defendants treated the assets, if any, and the debts of the State to State Companies as interchangeable with their own.

48.     On information and belief, for the Corporate Defendants and unnamed business entities there was (1) an absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like; (2) inadequate capitalization; (3) funds were put in and taken out of the corporation for personal rather than corporate purposes; (4) an overlap in ownership, officers, directors, and personnel; (5) common office space, addresses, and telephone numbers of corporate entities; (6) lack of business discretion displayed by the dominated business entities; (7) lack of arms-length transactions with each other; (8) no treatment as independent profit centers; (9) payment or guarantee of debts, or both, by corporations in the group; and (10) property used by other corporations as if it were its own.

49.     By abusing the privilege of doing business in the corporate form, the Individual Defendants, together with others, have damaged plaintiffs and should therefore be held liable for the Judgment rendered against any or all, or some combination thereof, of the State to State Companies.

50.     The State to State Companies are the alter egos of each other, and by extension the Nadel Defendants, together with others, through similar means as detailed above.

## DEFENDANTS' FRAUDULENT SCHEME AND ENTERPRISE DIRECTLY HARMS PLAINTIFF CORY HAMMOCK

51.     On August 24, 2018, Hammock sought an interstate moving company for his upcoming cross-country move from Alexandria, Virginia to Salt Lake City, Utah.

8

52.     Hammock submitted information about himself and his moving requirements to a third-party website, to solicit bids from authorized movers to pack, load, and transport his belongings and effects.

53.     Later that same day, Hammock received a text message and a phone call from someone who identified themselves as "Grant Kennedy," a customer service representative employed by Defendant STS.

54.     Mr. Kennedy represented Defendants as a broker and a carrier service capable of conducting a full door-to-door move for Mr. Hammock.

55.     Mr. Kennedy promised that Defendants could provide boxes, packing material, and labor, all comprising Defendant STS's "platinum package."

56.     On August 31, 2018, Hammock contracted with Defendant STS to load, pack, and transport his belongings and effects with a load date of September 9, 2018.

57.     A moving team arrived at Plaintiff's domicile on September 9, 2018.

58.     On September 10, 2018, at 12:30 a.m., a member of the moving team informed Hammock that he needed to pay $1,300-$1,400 in addition to the price given in the contract.

59.     Hammock refused to pay the additional cost.

60.     The same member of the moving team continued to insist on receiving the additional payment.

61.     Not having received the additional payment, the moving team departed with their truck loaded with Plaintiff's belongings and effects without giving notice to Hammock.

62.     The moving team left without providing a receipt, a bill of lading, a weight receipt, or any documentation whatsoever referencing the labor or service provided.

63.     That same day, Hammock made multiple attempts to contact Defendants and Mr. Kennedy directly.

64.     Eventually, Hammock finally managed to speak to Mr. Kennedy, who informed him that he had been correct to refuse paying additional money to the moving team.

65.     Mr. Kennedy then told Hammock to wait for a follow-up call, but no such call came.

66.     Hammock continued to call Defendants' customer service line, only to receive canned, unhelpful responses.

67.     For approximately the next twelve months, the Defendants continued to hold Hammock's belongings as leverage to get him to pay more than he had agreed to pay.

68.     Hammock was deprived of nearly all his worldly belongings for nearly a year, with no idea as to whether he could expect to ever get them back.

## PLAINTIFF HAMMOCK'S NON-JUDICIAL EFFORTS TO RECOVER HIS BELONGINGS

69.     On September 18, 2018, Hammock contacted the Federal Motor Carrier Safety Administration (the "FMCSA") to lodge a complaint against STS.

70.     The FMCSA informed Hammock that Mr. Kennedy had misrepresented Defendant STS as a carrier to Plaintiff, and that in fact, it was registered only as a broker.

71.     At the time Hammock engaged Defendant STS, STS's website held itself out as a "Moving Company That You Can Trust."

72.     Defendant STS's website further advertised that STS had "teams of experienced movers [who] help[] thousands of people complete moves."

73.     On September 24, 2018, Hammock's counsel, Bryce Jones, sent a demand letter to Defendant STS, via mail and email, requesting that STS "advise us of the status of our client's

property immediately, whether and when it will be delivered to him, and what [STS] intend[s] to charge him for the final delivery price."

74.   The next day, Defendant STS responded to the demand letter via e-mail, disclaiming all liability and threatening to hold Plaintiff liable for attorney's fees.

75.   Defendant STS further claimed in its response that Plaintiff was "well aware" of the status of Plaintiff's goods and other information he was seeking. They stated that that he would "continue to be informed about the move with his assigned carrier, and any information regarding his final bill is available to him."

76.   Plaintiff's counsel Bryce Jones then replied via e-mail that he thought litigation might be avoided entirely if Defendant STS would just answer six simple questions in writing within 24 hours.

77.   Over a week later, Plaintiff still had not received any information regarding his assigned carrier or final bill.

## PLAINTIFF HAMMOCK BEGINS THIS ACTION

78.   On October 9, 2018, Plaintiff started this action by filing a complaint against Defendant STS and Unknown Defendants 1-10 ("Does 1-10").

79.   Defendant STS was served via the New York Secretary of State and at its principal place of business.

80.   Prior to time lapsing for Defendant STS to file its Answer, agents of Defendant STS spoke with Plaintiff's counsel no fewer than two times via phone, during which phone calls they were informed of the suit and advised to hire counsel.

81.     Rather than doing so, Defendant STS repeatedly reached out to Hammock directly, threatening him that his irreplaceable personal belongings would be disposed of if Hammock did not pay them additional money.

82.     Defendant STS elected not to respond to this lawsuit and the clerk issued a Certificate of Default as to Defendant STS on November 21, 2018 (ECF No. 11).

83.     Thereafter, on or around January 3, 2019, Plaintiff's counsel spoke to a man who identified himself as "Joe" and a co-owner of Defendant STS. As alleged above, Yarin Nadel did business as, is also known as, and holds himself out as Joe Nadel or New York Joe.

84.     When advised of the pending motion for default, "Joe" implied that he would not comply with any court orders and that he was shutting the company down that day.

85.     In subsequent conversations on January 4th, 5th, and 7th of 2019 and in a message left with Plaintiff's counsel's office, this man stated he was "Joe Miller," and confirmed that he was a co-owner of at least two of the defendant companies, Moving State to State, LLC and State to State Moving NY Inc.

86.     In the six months that followed, Hammock struggled to determine: (1) the location and status of his belongings, and (2) the true beneficial owners of Defendant STS. Hammock undertook significant investigation to uncover such information, with mixed success.

87.     As further detailed herein, on or around August 20, 2019, Plaintiff Hammock did have some of his property returned to him with some items damaged and others missing.

88.     This property of Plaintiff Hammock was returned only after a civil enforcement action brought by the United States compelled the Defendants to return Hammock's belongings, and publicly identified Defendant Michael Nadel and Defendant Yarin Nadel as the owners and operators of the Corporate Defendants. *See United States v. Nadel*, No. 19 Civ. 01578 (E.D.N.Y.).

## PLAINTIFF ANGELA BYNUM

89.     On September 14, 2018, Plaintiff Bynum submitted information regarding her upcoming move from Newport News, Virginia, to Kent, Washington, to a third-party website to solicit bids from authorized movers to pack, load, and transport her belongings and effects.

90.     On September 15, 2018, Bynum was contacted via email by someone identifying herself as "Gemma Collins" and representing herself as a customer service representative employed by Defendant STS.

91.     The signature block on Ms. Collins's email identified her as an employee of Moving State to State LLC.

92.     On or about October 2, 2018, Bynum spoke with Ms. Collins over the phone during which time Ms. Collins took a full inventory of Bynum's household items, stating that this was needed to provide a more accurate cost estimate.

93.     On or about October 3, 2018, after having received further information as to the start date of her new job in the state of Washington, Bynum reached out to Ms. Collins.

94.     During a phone conversation, Ms. Collins assured her that she had reserved a truck owned by Defendant STS to move Bynum's items. Ms. Collins further represented that Bynum's items would be the only items in this truck.

95.     On October 4, 2018, Bynum emailed Ms. Collins to clarify if she was dealing with a brokerage or a carrier. Ms. Collins stated that they were both a brokerage and a carrier, that they owned trucks but also contracted with "sister carriers."

96.     On or about October 4, 2018, Bynum signed a virtual contract specifying the transport by Moving State to State LLC of specific items on October 13, 2018.  The contract further stated that Bynum would receive her items at her new home no later than November 3, 2018.

97.     On October 13, 2018, a team of movers employed by Defendant STS arrived at Bynum's house in Virginia in order to pack her items. At this time, Bynum noticed that they were not driving a truck with Defendant STS's company name or logo.

98.     Bynum asked the leader of the moving team, "Clifford" why he was not driving a State to State truck. Clifford replied that he did not know "anything about that."

99.     The movers then packed up Bynum's belongings and left the premises to have the truck weighed.

100.     During the packing process, Bynum repeatedly tried to contact Ms. Collins and Defendant STS but was not able to get ahold of them once.

101.     Bynum tried to contact them for several reasons, including: the fact that the movers did not appear to be driving a truck owned by Defendant STS, the fact that they damaged Bynum's hardwood floors, and because they left a large quantity of debris and trash throughout her home.

102.     Later that same day, Clifford returned and informed Bynum that her belongings weighed significantly more than the estimate had initially suggested. He then stated that she would have to make an additional payment of approximately $3000 in certified funds. She provided this payment.

103.     That same day, Clifford provided Bynum with a contract stating that her items would arrive at her new residence between October 14, 2018, and December 4, 2018.

104.     On October 20, 2018, Bynum called Defendant STS and spoke with a representative named "Kira."

105.     Kira informed Bynum that she would need to make an additional payment in certified funds to Defendant Green Peace Transportation, LLC, upon receipt of her items.

106.    On or about December 4, 2018—over a month after the final date of the agreed-upon window per Bynum's contract with STS—Bynum finally received her things. They arrived on a truck owned by a company called AVI Transport, Inc., and Bynum was required to pay $3,000 to the driver for delivery of the items.

107.    Defendants damaged $5,500 of Bynam's property. The damaged items included a custom couch, two TV consoles, a rug, a queen mattress, books with water damage, and a broken accent chair leg. Bynum's office chair (valued at $400) was missing, as well as numerous boxes.

## PLAINTIFF ANGIOLINA ULERIO-URBAEZ

108.    To assist her in her move from New Hampshire to Florida in early 2019, Plaintiff Ulerio-Urbaez posted an advertisement on a third-party website seeking the services of a moving company.

109.    On or about January 16, 2019, Plaintiff Ulerio-Urbaez received an email from a person representing herself as "Chloe Harper," Senior Relocation Specialist of Moving State to State LLC, offering their services.

110.    Plaintiff Ulerio-Urbaez asked whether the items could be picked up between the 27th and the 29th of January 2019 and delivered by the 3rd of February and received assurances from Ms. Harper that the items could be delivered by then, after being put in storage, if necessary. She stated words to the effect that "we have you set up to go to storage if you need to then we can re-deliver when your there"

111.    After forwarding a list of items to be moved and having the list confirmed by a "Corey Bishop," identified as a Senior Relocation Specialist of state2statemoves.com, Plaintiff Ulerio-Urbaez received a "Moving Estimate" that indicated the "estimated volume" of the items was 3,605 lbs., and requested a "Total Estimated Quote" of $2,417.23.

15

112.     Ms. Harper indicated on January 16, 2019, that "I lowered the deposit too for you" since no storage was required, so on January 17, 2019, Jose Arismendy Batista-Campusano, then-husband of Plaintiff Ulerio-Urbaez, authorized the charge to his credit card by "State to State Moving Group LLC."

113.     On or about January 28, 2019, Plaintiff Ulerio-Urbaez delivered the agreed items to a truck driver who said he worked for State to State Moving Group LLC.

114.     Plaintiff noticed a large quantity of other items not belonging to her already in the truck into which her property was placed.

115.     Plaintiff Ulerio-Urbaez subsequently was contacted by email with a "Certified Automated Truck Scale certificate" labelled Green Peace, showing that a truck in Willington, CT had a gross weight of 17,980 lbs. Included in the email was also a demand for an extra $5000 to complete the move.

116.     After Plaintiff Ulerio-Urbaez remitted the additional money, her items were delivered by a moving person who claimed to be an independent contractor who was called to bring her items. Plaintiff noted that the truck was labelled, "Enterprise Rental Truck."

117.     The driver of the truck indicated that he was not given the contract when the items were placed on his truck, and although he contacted five to seven people, he was unable to directly reach someone to confirm the inclusion of certain items or services (such as upstairs delivery) in her contract nor did he receive a register of the items and their condition.

118.     Plaintiff Ulerio-Urbaez was required by the driver to pay a "stairs fee" at the time of delivery.

119.     Certain items belonging to Plaintiff Ulerio-Urbaez went missing in transit, and the majority of her items were damaged.

120.    Plaintiff Ulerio-Urbaez was contacted by "Ashely Johnson," whose title is listed as "Customer Service" of state2statemoves.com or "Green Peace Transportation LLC" on or about March 11, 2019.

121.    Ms. Johnson offered her a claims form, and said Plaintiff had to "provide the inventory list that was done on the day of pick up," and said that the claim would "reach arbitration" in "45 to 90 days." Plaintiff was instructed to mail the form to greenpeacetransportation@gmail.com.

122.    Despite duly following these instructions and repeatedly attempting to follow-up, Plaintiff Ulerio-Urbaez was never contacted by any of the Defendants or their representatives again.

123.    Plaintiff Ulerio-Urbaez was forced to replace the majority of her belongings.

124.    Plaintiff also suffered dislocation of her left shoulder and pain in her left arm from sleeping on the floor while her belongings were being held by the movers.

125.    The loss and replacement of the majority of her belongings, as well as the medical bills related to her shoulder and arm cost Plaintiff Ulerio-Urbaez approximately $20,000 in damages.

## THE UNITED STATES INITIATES A CIVIL ACTION AGAINST YARIN NADEL AND MICHAEL NADEL

126.    On March 19, 2019, the United States, through the Department of Justice, initiated a civil action against Defendant Yarin Nadel, Defendant Michael Nadel, and the various Corporate Defendants to this action, alleging "ongoing commission of criminal wire fraud" and requested injunctive relief. *See United States v. Nadel et al.,* Dkt. No. 1, 19 Civ. 01578 (E.D.N.Y.). A copy of the Government's complaint is attached hereto as Exhibit C.

127.   The Government's investigation and resultant action was based in part upon the Plaintiff's complaints, and those of dozens of other customers who had been similarly victimized by the Defendants' unlawful business practices.

128.   In the complaint filed in *United States v. Nadel*, this action is referenced at Paragraphs 18-19, and the Plaintiff in this action is identified as "Customer-1".

129.   On May 8, 2019, Defendants moved to have the temporary restraining order previously entered by the Court (ECF No. 17) restraining Defendants from "removing personal property originally received from customers" so that they could return the property to five customers. *See* ECF Nos. 22-23.

130.   On October 21, 2019, Dmitriy Shakhnevich – attorney for Defendants Michael Nadel, Yarin Nadel, Moving State to State LLC, State to State Moving NY Inc., State to State Moving Group LLC, Direct Van Lines Services Inc., and Around the Clock Moving Services, Inc. and acting as their agent – entered into a consent decree with the United States in the civil action.

131.   District Judge Margo K. Brodie ordered the Consent Decree and Final Judgment on October 24, 2019.

132.   Under the Consent Decree and Final Judgment, Defendants and each and all of their directors, officers, agents, servants, employees, successors, assigns, and attorneys, and all person or entities in active concert or participation with any of them were permanently enjoined from: (a) committing wire fraud, as defined by 18 U.S.C. § 1343; (b) raising the price of delivery, rate "per box," "per item," or "per pound," or the required deposit for services for any customers on the day of pickup or in the preceding 72 hours, (c) destroying, deleting, removing, or transferring any and all business, financial, accounting and other records concerning Defendants' operations and the operations of any other corporate entity owned or controlled, in whole or in part, by Defendants

for a period of ten years from the date of entry of the Consent Decree. *See United States v. Nadel et al.,* Dkt. No. 37, 19 Civ. 01578 (E.D.N.Y.). A copy of the Government's Consent Decree and Final Judgment is attached hereto as Exhibit D.

133.    Prior to the Consent Decree and Final Judgment, Counsel for Plaintiff Hammock also reached out to Defendants' counsel of record and negotiated for the return of Plaintiff's property, which the Court ordered. *See United States v. Nadel et al.,* Dkt. No. 30, 19 Civ. 01578 (E.D.N.Y.) (Brodie, J., ordering upon the consent to return the Plaintiff's property on July 24, 2019).

134.    On or around August 20, 2019, some of Plaintiff Hammock's property was returned to him, with some damaged and missing items.

**THE CRIMINAL ACTION AGAINST
YARIN NADEL AND MICHAEL NADEL**

135.    On October 19, 2019, the United States filed criminal charges against Michael Nadel and Yarin Nadel. *See United States v. Nadel et al.,* No. 19 Cr. 00493 (E.D.N.Y.) (ENV) (VS). See Exhibit B.

136.    Count I of the Criminal Complaint charged the Nadel Defendants with conspiracy to defraud the United States with, among other things, using fraudulent principal addresses and mailing addresses, and failure to disclose affiliations and relationships as required by federal law.

137.    Counts II-V charged the Nadel Defendants with making false, fictitious statements and entries to government agencies.

138.    Count VI charged that the Nadel Defendants "together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud customers and potential customers of the State to State Companies, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of

executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate commerce . . . contrary to Title 18, United States Code, Section 1343."

139.    On June 24, 2021, Michael Nadel entered a guilty plea to Count Six of the Indictment. *See* Exhibit A.

140.    The Court (Hon. Eric N. Vitaliano) found that the plea was made knowingly and voluntarily and not coerced.

141.    The Court found a factual basis for the plea and accepted the plea of Guilty to Count Six of the Indictment.

142.    On June 24, 2021, Yarin Nadel entered a guilty plea to Count Six of the Indictment.

143.    The Court (Hon. Eric N. Vitaliano) found that the plea was made knowingly and voluntarily and not coerced.

144.    The Court found a factual basis for the plea and accepted the plea of Guilty to Count Six of the Indictment.

145.    Defendant Michael Nadel is currently represented in the criminal case by attorney Jonathan B. Strauss of 233 Broadway 900, New York, NY 10279.

146.    Defendant Yarin Nadel is currently represented in the criminal case by attorney Meir Moza, of the Law Offices of Meir Moza 217 Mineola Ave., Mineola, NY 11501.

## **CLASS ALLEGATIONS**

147. Plaintiffs Hammock, Bynum and Ulerio-Urbaez seek to represent a class defined as all people who were harmed by defendants' scheme and artifice to defraud customers and potential customers of the State to State Companies and other unknown business entities and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing this scheme.

148. Specifically excluded from the Class are Defendants, Defendants' officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or Defendants' officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

149. Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

150. **Numerosity**. The members of the Class are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable. Upon information and belief, Plaintiff reasonably estimates that there are thousands of members in the Class. Although the precise number of Class members is unknown to Plaintiff, the true number of Class members is known by Defendant and may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

151.     **Existence and predominance of common questions of law and fact.** Common questions of law and fact exist as to all members of the Class and Subclass and predominate over any questions affecting only individual Class members. These common legal and factual questions include, but are not limited to, the following: (a) whether Defendants extorted money from the customers, (b) whether Defendants made false statements and misrepresentations; (c) whether Defendant has provided the services for which Class and Subclass members contracted; and (d) whether Class and Subclass members are entitled to a refund for that portion of the fees that was contracted for services that Defendant did not provide. (e) whether Defendant has unlawfully converted property; and (d) whether Defendant is liable to Plaintiff and the Class.

152.     **Typicality.** Plaintiff's claims are typical of the claims of the other members of the Class in that, among other things, all Class members were similarly situated and were comparably injured through Defendant's wrongful conduct as set forth herein. Further, there are no defenses available to Defendants that are unique to Plaintiff.

153.     **Adequacy of Representation.** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel that is highly experienced in complex litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class. Furthermore, Plaintiff has no interests that are antagonistic to those of the Class.

154.     **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense of individual litigation of their claims against Defendant. It would, thus, be virtually impossible for the Class or Subclass on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if Class members could afford such individualized litigation, the court system

22

could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

155.    In the alternative, the Class may also be certified because: (a) the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the Defendant; (b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or (c) Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

**FIRST CLAIM**
**Under RICO Section 1963(c)**
**(As Against All Defendants)**

156.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

157.    The conduct described above violates the provision of 18 U.S.C. § 1963(c).

158.    The enterprise was the interstate moving business or, alternatively, the association in fact of Yarin Nadel, Michael Nadel, the State to State Companies, and other unknown natural person and business entities engage in the scheme to defraud. The enterprise had a district purpose and structure.

159.    The systematic mail and wire fraud, 18 U.S.C. §§ 1341 and 1343, by Defendants was racketeering activity.

160.    Defendants' fraudulent scheme necessarily involved thousands of violations of the mail and wire fraud statutes because it could not have functioned without telephones, emails and communication through the internet.

161.    Defendants' racketeering activity constitute a pattern in the conduct had a central purpose of extorting money from customers.

162.    As described above, each defendant committed at least two acts of racketeering.

163.    Plaintiff is therefore entitled to recover damages in an amount to be determined at trial.

**SECOND CLAIM**
**Under RICO Section 1963(d)**
**(As Against All Defendants)**

164.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

165.    Defendants conspired to make the violations described above.

166.    Defendants also agreed to the unlawful purpose of the conspiracy to extort money from customers through fraudulent means.

167.    Each of the Defendants knew of the existence of the unlawful actions of the Nadels' moving business, which acted in interstate commerce.

168.    Each of the Defendants knowingly joined the conspiracy to participate in the conduct of the Nadels' moving business in an illegal an illicit manner.

169.    Plaintiff is therefore entitled to recover damages in an amount to be determined at trial.

**THIRD CLAIM**
**For Violation of New York's Consumer Protection**
**from Deceptive Acts and Practices Act,**
**N.Y. Gen. Bus. Law § 349 *et seq.***
**New York General Business Law Section 350)**
**(As Against All Defendants)**

170.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

171.    Defendants have engaged in deceptive acts and practices in the conduct of their business.

172.    By misrepresenting the nature of their business, Defendants have willfully and knowingly violated New York consumer protection laws.

173.    Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service."

174.    New York General Business Law Section 350-a defines "false advertising" ad "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect."

175.    Defendants have held themselves out as a mover to the public.

176.    They have privately asserted to Plaintiff that they are not, in fact, a mover or carrier but a broker.

177.    As a direct and proximate result of Defendants' violation of New York General Business Law Section 350, Plaintiff has suffered an ascertainable loss and therefore seeks actual and punitive damages.

## FOURTH CLAIM
### For Fraudulent Conveyance
### (As Against All Defendants)

178.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as though fully set forth herein.

179.    Defendants have conspired to defraud Plaintiff, a likely judgment creditor, by shifting assets and threatening to close one or more businesses out of spite.

180.    Such actions satisfy the criteria for maliciousness. Any such transactions should be voided and punitive damages awarded.

### FIFTH CLAIM
### For Fraud
### (As Against All Defendants)

181.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

182.    Defendants made material false statements and misrepresentations to Plaintiff that were fraudulent.

183.    Plaintiff is a direct victim of the scheme.

184.    Defendants conspired among themselves and with others to commit this fraud.

185.    Plaintiff is therefore entitled to recover damages in an amount to be determined at trial.

### SIXTH CLAIM
### For Negligent Misrepresentation
### (As Against All Defendants)

186.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

187.    The representations specified above and those representations made by Defendants regarding its carrier status were untrue and that Defendants made those representations without reasonable grounds for believing the representations to be true.

188.    Plaintiff reasonably relied on the representations and, *inter alia*, paid $3,827.69 to Defendants under the belief that they were a carrier.

189.    As a direct and proximate result of the foregoing, Plaintiff has incurred damages in the amount to be determined at trial.

190.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

## SEVENTH CLAIM
### For Conversion
### (As Against All Defendants)

191.    Defendants have intentionally interfered with Plaintiff's rights in his property.

192.    Plaintiff has asserted his rights in his property against Defendants.

193.    Defendants nonetheless refused to provide him access to his belongings and effects.

Plaintiff is therefore entitled to recover damages in an amount to be determined at trial.


## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief as follows:

A.    An order certifying the case as a class action pursuant to Federal Rule of Civil Procedure 23;

B.    A judgment declaring that Defendants have committed the violations alleged in this case under federal and state law;

C.    Award actual, compensatory, statutory, consequential damages;

D.    Award punitive and treble damages;

E.    Award equitable monetary relief, including restitution and disgorgement of all ill-gotten gain, and the imposition of a constructive trust upon, or otherwise restricting the proceeds of Defendants' ill-gotten gains, to ensure an effective remedy;

F.    Award Plaintiffs the costs of this action, including reasonable attorneys' fees and expenses and expert fees;

G.    Award pre-judgment and post-judgment interest at the highest rate allowed by law; and

H.     Piercing of each and every corporate veil so that the Individual Defendants are liable for any and all judgment(s) against any and all of the State to State Companies, each business entity named as a defendant is liable for the judgment(s) against the other business entities.

I.     Award such other and further relief the Court deems just and proper.

## JURY DEMAND

Plaintiff respectfully demands a jury trial on all issues so-triable by right.


Dated: February 23, 2022
       New York, New York


                              Respectfully submitted,

                              /s/ Bryce Jones
                              T. Bryce Jones, Esq.
                              Jones Law Firm, P.C.
                              *Attorneys for Plaintiffs*
                              1270 Avenue of the Americas, 7th Floor
                              New York, NY 10020
                              (212) 258-0685
                              bryce@joneslawnyc.com

# EXHIBIT A

BEFORE HONORABLE ERIC N. VITALIANO
UNITED STATES DISTRICT JUDGE


<u>DATE: 6/24/2021</u>


<u>CRIMINAL CAUSE FOR GUILTY PLEA (IN-PERSON)</u>

**DOCKET # 19cr493 (ENV)**


<u>Defendant</u>                                          <u>COUNSEL</u>

Yarin Nadel                                         Meir Moza


AUSA: Benjamin Weintraub

Interpreter: n/a

COURT REPORTER: Georgette Betts

Pretrial Officer: n/a

Courtroom Deputy: William Villanueva

X        DEFT SWORN

X        CASE CALLED FOR PLEADING

X        DEFENDANT WAIVES INDICTMENT.

X        DEFENDANT ENTERS A PLEA OF GUILTY TO COUNT 6 OF THE INDICTMENT

X        COURT FINDS THAT THE PLEA WAS MADE KNOWINGLY & VOLUNTARILY AND
         NOT COERCED. COURT FINDS FACTUAL BASIS FOR THE PLEA & ACCEPTS PLEA OF GUILTY
         TO <u>COUNT 6 OF THE INDICTMENT.</u>


Time in Court: 60 MINUTES

# EXHIBIT B

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ OCT 25 2019 ★

BROOKLYN OFFICE

SSS:GK
F. #2019R00131

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

MICHAEL NADEL and
YARIN NADEL,
      also known as "Joe Nadel,"

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

I N D I C T M E N T

CR 19 493

(T. 18, U.S.C., §§ 371, 981(a)(1)(C),
1001(a)(3), 1349, 2 and 3551 et seq.;
T. 21, U.S.C., § 853(p); T. 28, U.S.C.,
§ 2461(c))

VITALIANO, J.

SCANLON, M.J.

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.    The Defendants and Relevant Entities

        1.    The defendant MICHAEL NADEL was a resident of Queens, New York, and was an owner, officer and operator of several affiliated companies engaged in the interstate transportation of household goods and property by motor carrier, including but not limited to Around the Clock Moving Services, Inc.; Direct Van Lines Services, Inc.; State to State Moving NY Inc.; Green Peace Transportation LLC; Moving State to State LLC and State to State Moving Group LLC (collectively, the "State to State Companies").

        2.    The defendant YARIN NADEL, also known as "Joe Nadel," was a resident of Queens, New York, and was an owner, officer and operator of the State to State Companies.

3.       Around the Clock Moving Services, Inc. was a New York corporation that maintained a principal place of business in Queens, New York.

4.       Direct Van Lines Services, Inc. was a New York corporation that maintained a principal place of business in Queens, New York.

5.       State to State Moving NY Inc. was a New York corporation that maintained a principal place of business in Queens, New York.

6.       Green Peace Transportation LLC was a Pennsylvania limited liability company that maintained a reported principal place of business in Levittown, Pennsylvania.

7.       Moving State to State LLC was a New York limited liability company that maintained a principal place of business in Queens, New York.

8.       State to State Moving Group LLC was a New York limited liability company that maintained a principal place of business in Queens, New York.

II.     The Interstate Moving Services Fraudulent Scheme

A.      Federal Regulations Governing Moving Companies

9.       During all relevant times, companies engaged in the transportation of household goods in interstate commerce were subject to federal regulations set forth in Title 49, Code of Federal Regulations, Section 375.

10.      A company engaged in the transportation of household goods was required to provide customers with a written estimate of the charges for transportation and all related services based on a telephonic or physical inventory of the goods to be shipped, and to indicate whether the estimate was binding or non-binding.

11.      A binding estimate was an agreement made prior to transportation that guaranteed the total cost of the shipment based on the quantities and services listed in the

estimate. For binding estimates, a company was required to deliver the household goods, as contracted, upon full payment of the original estimate amount. Any costs associated with the shipment of additional household goods or services that were not identified in the binding estimate were permitted to be billed after the goods were delivered. 49 C.F.R. § 375.403.

12. For non-binding estimates, the final charges were based on the actual weight or volume of the shipment, the services provided and the tariff provisions in effect. The final charges for a shipment involving a non-binding estimate were not permitted to be increased above the initial estimate by more than 10 percent. 49 C.F.R. § 375.703(b).

B.    The Fraudulent Scheme

13. In or about and between February 2018 and July 2019, the defendants MICHAEL NADEL and YARIN NADEL, also known as "Joe Nadel," together with others, agreed to defraud customers and potential customers of the State to State Companies, directly and through brokers, by misrepresenting the estimated charges for their moving services and then requiring customers to pay additional fees, often more than 10 percent of the original estimate, by refusing to return, and threatening to sell and auction, the customers' belongings if the fees were not paid.

14. As a part of the scheme, the defendants, together with others, registered corporate entities, including but not limited to the State to State Companies, often using fictitious names and business addresses, which the defendants, together with others, owned, operated and controlled, and used for their interstate moving business.

15. As a further part of the scheme, the defendants, together with others, induced customers to contract with the State to State Companies by making false representations that the State to State Companies offered competitive rates for premium

interstate moving services.   Among other things, the defendants, together with others,
(i) quoted estimated charges for their moving services that they had no intention of honoring;
(ii) misrepresented the number, ownership and United States Department of Transportation
("USDOT") registration of the trucks to be used to transport customers' goods;
(iii) misrepresented the number of movers who would transport the customers' goods; and
(iv) misrepresented various quality control measures that would be used in transporting the
customers' goods.

      16.    As a further part of the scheme, on or after the agreed-upon pick-up
dates, employees of the State to State Companies arrived at customers' residences, often in
rental trucks that were too small or too few to accommodate the volume of goods to be
shipped.

      17.    As a further part of the scheme, at various points in the loading
process—and often after customers' household goods were completely loaded into the
trucks—the defendants, together with others, told the customers in person, by email and by
telephone, that due to some unforeseen circumstance, additional fees were due.   The
additional fees often exceeded the 10 percent price increase restriction for non-binding
estimates set forth in Title 49, Code of Federal Regulations, Section 375.703(b).   The
defendants, together with others, demanded payment of these fees, often in cash, before the
State to State Companies would deliver the household goods to the customers.

      18.    As a further part of the scheme, if customers of the State to State
Companies refused to pay the additional fees, in some instances, the defendants, together
with others, threatened to keep the customers' belongings in storage, and to charge and remit
additional storage fees to the customers.

19. Many customers of the State to State Companies ultimately paid the inflated additional fees to ensure delivery of their possessions. In many instances, the customers' belongings were delivered weeks or months after the scheduled delivery dates and valuable items were damaged or missing.

20. As a result of the fraudulent scheme, the defendants MICHAEL NADEL and YARIN NADEL, also known as "Joe Nadel," together with others, wrongfully obtained at least $100,000 in additional fees from dozens of customers of the State to State Companies, and caused damage to the customers' personal belongings.

III.  The Reincarnated or Affiliated Motor Carrier Scheme

A.  Federal Motor Carrier Safety Laws and Regulations

21. The Federal Motor Carrier Safety Administration ("FMCSA") was an agency of USDOT. Its primary mission was to reduce fatalities and injuries involving commercial motor vehicles. FMCSA adopted regulations governing commercial motor carriers ("motor carriers"), including regulations requiring them to be properly licensed, insured, maintained and operated.

22. During all relevant times, motor carriers operating in interstate commerce were required to register with FMCSA and obtain a USDOT number. 49 U.S.C. §§ 13901-13904. A USDOT number was a unique identifier that aided FMCSA in collecting and monitoring a motor carrier's safety record and other information, including but not limited to audits, compliance reviews, crash investigations and inspections. Depending on the nature of the business of the motor carrier, many motor carriers operating in interstate commerce, including motor carriers engaged in the shipment of household

goods, were also required to obtain interstate operating authority from USDOT.   49 C.F.R
§ 365.105.

23.     To obtain a USDOT number and operating authority, motor carriers
were required to complete and submit to FMCSA, under penalty of perjury, a Form
MCSA-1.   Form MCSA-1 required an applicant to provide, among other things, the
following information: (i) the motor carrier's business address; (ii) the motor carrier's
insurance information; (iii) information regarding the motor carrier's compliance with
USDOT safety regulations; and (iv) the motor carrier's relationship and affiliation with any
other motor carrier within the preceding three years.   A motor carrier was also required to
submit Form MCS-150 (Motor Carrier Identification Report) to provide biennial updates and
to report any material changes, such as a change in ownership.

24.     If a motor carrier planned to cease all or some of its operations, the
motor carrier was permitted to voluntarily request the revocation of all or part of its operating
authority by completing and submitting to FMCSA, under penalty of perjury, a Form OCE-
46 (Request for Revocation of Authority Granted).

25.     To prevent motor carriers from concealing poor safety or compliance
records, motor carriers were required to identify reincarnated or affiliated motor carriers,
collectively defined as motor carriers with common ownership, management, control or
familial relationship.   49 C.F.R. § 385.1003.   In particular, Title 49, Code of Federal
Regulations, Section 385.1005 prohibited two or more motor carriers from using common
ownership, management, control or familial relationship to avoid compliance with legal
requirements or otherwise conceal non-compliance or a history of non-compliance.

26.     FMCSA's New Entrant Safety Assurance Program applied to motor carriers applying for a USDOT number (a "New Entrant").   Pursuant to this program, a New Entrant was monitored during an initial 18-month period, and FMCSA or State employees were expected to conduct a Safety Audit within 12 months after the New Entrant began operations.   If a New Entrant did not submit to this initial safety audit, its New Entrant registration was revoked, and the New Entrant's operations were removed from service.

27.     In addition to New Entrant Safety Audits, FMCSA routinely performed compliance reviews of motor carriers.   A compliance review consisted of an on-site examination of the motor carrier's operations, such as drivers' hours of service, maintenance and inspection of vehicles, driver qualifications, commercial driver's license requirements, financial responsibility, accidents, hazardous materials and other safety and transportation records.   The purpose of the compliance review was to determine whether a motor carrier met the safety fitness standard established in Title 49, Code of Federal Regulations, Section 385.5.  FMCSA also conducted compliance reviews in response to requests to change a safety rating, to investigate potential violations of safety regulations by motor carriers and to investigate complaints or other evidence of safety violations.

28.     A motor carrier was issued a safety rating after FMCSA completed a compliance review.   There were four types of safety ratings: Satisfactory, Conditional, Unsatisfactory and Unrated.   A motor carrier's safety rating, among other things, affected its insurance rates and ability to compete for business.

29.     FMCSA maintained an online records repository called the Safety and Fitness Electronic Records ("SAFER") System that was accessible on a website.  FMCSA uploaded information provided by a motor carrier, including the business name, business

address, business telephone number and insurance information, onto the SAFER System.

Information regarding the number of drivers, crashes, insurance and bonds, inspections and

enforcement activity was also available on the SAFER System.   The public could access the

SAFER System to assess a particular motor carrier.

B.   The Fraudulent Scheme

30.   In or about and between November 2015 and July 2019, the defendants

MICHAEL NADEL and YARIN NADEL, also known as "Joe Nadel," together with others,

agreed to defraud the United States and USDOT by knowingly and intentionally completing

and submitting, under penalty of perjury, forms to USDOT regarding motor carriers that the

defendants owned, operated and controlled, which forms they knew contained false

information and failed to disclose the motor carriers' affiliations with other motor carriers

whose operating authority had been revoked or suspended by FMCSA.

31.   On or about November 20, 2015, the defendant MICHAEL NADEL

applied to obtain a USDOT number for Around the Clock Moving Services, Inc.

32.   FMCSA contacted Around the Clock Moving Services, Inc., conducted

a site visit and scheduled an appointment to conduct a focused commercial investigation.

On or about September 16, 2016, prior to the scheduled appointment, the defendant

MICHAEL NADEL completed, under penalty of perjury, a Form OCE-46, which he later

submitted to FMCSA, in which he identified the reason for filing as "Out of Business."

Around the Clock Moving Services, Inc.'s operating authority subsequently was revoked on

or about October 31, 2016.

33.   Following the revocation of Around the Clock Moving Services, Inc.'s

operating authority, the defendants, together with others, continued operating the State to

State Companies through various reincarnated or affiliated motor carriers, which they used to evade safety regulations and accountability.   The defendants, together with others, took steps to hide affiliations among the various motor carriers that they owned, operated and controlled, including by obtaining registration numbers under the names of multiple corporate entities and by submitting forms to FMCSA on behalf of the State to State Companies that they knew contained false statements.   The defendants also failed to disclose the State to State Companies' affiliations with other motor carriers whose operating authority had been revoked or suspended by FMCSA.

34.     During all relevant times, the defendants, together with others, continued to transport household goods in interstate commerce in exchange for money.

COUNT ONE
(Conspiracy to Defraud the United States)

35.     The allegations contained in paragraphs one through 34 are realleged and incorporated as if fully set forth in this paragraph.

36.     In or about and between November 2015 and July 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MICHAEL NADEL and YARIN NADEL, also known as "Joe Nadel," together with others, did knowingly and willfully conspire to impede, impair, obstruct and defeat the lawful government functions of USDOT and FMCSA, departments and agencies of the United States, in the enforcement of safety regulations governing the use of commercial motor vehicles in interstate commerce.

37.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants did commit and cause the commission of, among others, the following:

## OVERT ACTS

(a)     On or about September 21, 2016, MICHAEL NADEL submitted to FMCSA, under penalty of perjury, a Form MCS-150 for Around the Clock Moving Services, Inc., in which he identified himself as the president of Around the Clock Moving Services, Inc. and provided a fraudulent principal address and mailing address.

(b)     On or about September 14, 2017, MICHAEL NADEL submitted to FMCSA, under penalty of perjury, a Form MCSA-1 for Direct Van Lines Services, Inc., in which he identified himself as the owner of Direct Van Lines Services, Inc. and failed to disclose Direct Van Lines Services, Inc.'s affiliation and relationship with Around the Clock Moving, Inc., whose operating authority had been inactivated.

(c)     On or about February 12, 2018, YARIN NADEL submitted to FMCSA, under penalty of perjury, a Form MCSA-1 for State to State Moving NY Inc., in which he identified himself as the president of State to State Moving NY Inc., provided a fraudulent principal address and mailing address and failed to disclose State to State Moving NY Inc.'s affiliation and relationship with Direct Van Lines Services, Inc. and Around the Clock Moving, Inc.

(d)     On or about April 2, 2018, YARIN NADEL submitted to FMCSA, under penalty of perjury, a Form MCSA-1 for Yarin Nadel, in which he identified himself as the company's Chief Executive Officer.   In the Form MCSA-1, YARIN NADEL disclosed the company's affiliation with State to State Moving NY, Inc., but failed to

disclose the company's affiliation and relationship with other State to State companies, including but not limited to Around the Clock Moving, Inc. and Direct Van Lines Services, Inc.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNTS TWO THROUGH FIVE
### (False Statements)

38.    The allegations contained in paragraphs one through 34 are realleged and incorporated as if fully set forth in this paragraph.

39.    On or about the dates listed below, within the Eastern District of New York and elsewhere, the defendants MICHAEL NADEL and YARIN NADEL, also known as "Joe Nadel," together with others, in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit: the USDOT and FMCSA, did knowingly and willfully make and use false writings and documents knowing the same to contain materially false, fictitious and fraudulent statements and entries, as set forth below.

| Count | Approximate Date | Document | False Statements/Entries | Defendant |
|-------|------------------|----------|--------------------------|-----------|
| Two | 9/21/2016 | Form MCS-150 for Around the Clock Moving Services, Inc. | Principal address; mailing address | MICHAEL NADEL |
| Three | 9/14/2017 | Form MCSA-1 for Direct Van Lines, Inc. | Lack of affiliation with other FMCSA-licensed entities | MICHAEL NADEL |
| Four | 2/12/2018 | Form MCSA-1 for State to State Moving NY, Inc. | Lack of affiliation with other FMCSA-licensed entities | YARIN NADEL |
| Five | 4/2/2018 | Form MCSA-1 for Yarin Nadel | Lack of affiliation with other FMCSA-licensed entities | YARIN NADEL |

(Title 18, United States Code, Sections 1001(a)(3), 2 and 3551 et seq.)

## COUNT SIX
(Conspiracy to Commit Wire Fraud)

40.     The allegations contained in paragraphs one through 34 are realleged and incorporated as if fully set forth in this paragraph.

41.     In or about and between February 2018 and July 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MICHAEL NADEL and YARIN NADEL, also known as "Joe Nadel," together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud customers and potential customers of the State to State Companies, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate commerce, one or more writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS ONE AND SIX

42.     The United States hereby gives notice to the defendants that, upon their conviction of either of the offenses charged in Counts One and Six, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

43.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

A TRUE BILL

FOREPERSON

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F.#: 2019R00131

FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

### EASTERN *District of* NEW YORK

### CRIMINAL DIVISION

## THE UNITED STATES OF AMERICA

*vs.*

*MICHAEL NADEL and YARIN NADEL, also known as "Joe Nadel,"*

Defendants.

## INDICTMENT

(T. 18, U.S.C., §§ 981(a)(1)(C), 1001(a)(3), 1349, 2 and 3551 et seq.;
T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____
*Foreperson*

*Filed in open court this _____ day,*

*of _____ A.D. 20 _____*

_____
*Clerk*

*Bail, $ _____*

_____

**Gillian A. Kassner, Assistant U.S. Attorney (718) 254-6224**

# EXHIBIT C

FILED

IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★  MAR 19 2019  ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

Plaintiff,

v.

YARIN NADEL aka JOE NADEL, JOE MILLER;
MICHAEL NADEL aka MICKEY MILLER;
MOVING STATE TO STATE LLC;
STATE TO STATE MOVING NY INC.;
STATE TO STATE MOVING GROUP LLC;
DIRECT VAN LINES SERVICES INC.; and
AROUND THE CLOCK MOVING SERVICES
INC.;

Defendants.

---

COMPLAINT

Civil Action No.

CV19-1578

BRODIE, J.

POLLAK, M.J.

Plaintiff, the UNITED STATES OF AMERICA, by and through the undersigned attorneys, hereby

alleges as follows:

## INTRODUCTION

1.      The United States brings this action for a temporary restraining order, preliminary

and permanent injunctions, and other equitable relief pursuant to 18 U.S.C. § 1345, in order to

enjoin the ongoing commission of criminal wire fraud in violation of *inter alia* 18 U.S.C. § 1343.

The United States seeks to prevent continuing and substantial injury to victims of fraud.

2.      Defendants are using wire communications, including the use of the internet,

electronic mail, and telephones, in interstate commerce to transmit fraudulent representations in

order to obtain money and property.

3.      Specifically, defendants Yarin and Michael Nadel are conducting an ongoing

fraudulent scheme through their interstate moving business, defendants Moving State to State

LLC, State to State Moving NY Inc., State to State Moving Group LLC, Direct Van Lines Services

Inc., and Around the Clock Moving Services Inc. (collectively, the Corporate Defendants or "State to State"). The defendants market services as moving brokers and/or carriers on the internet. When contacted by potential customers, the defendants make fraudulent statements designed to induce the potential customers to retain defendants' services and provide money and property to defendants. Later, after receiving the victims' property, the defendants make further misrepresentations in order to secure additional monies from the victims. If the victims refuse to pay additional monies, the defendants place the victims' property into storage and refuse to deliver the property until they receive the additional payments. If the victims continue to refuse to make the additional payments, the defendants threaten to sell or auction off the victims' property.

4.    For the reasons stated herein, the United States requests injunctive relief pursuant to 18 U.S.C. § 1345 to protect victims from the loss of their property and to enjoin defendants' ongoing scheme to defraud using wire communications in violation of *inter alia* 18 U.S.C. § 1343.

## JURISDICTION AND VENUE

5.    The Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1345 and 28 U.S.C. §§ 1331 and 1345.

6.    Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(1) & (2).

## PARTIES

7.    Plaintiff is the United States of America.

8.    Defendant Yarin Nadel resides in Fresh Meadows, New York, located in the Eastern District of New York. Yarin Nadel also does business as, is also known as, and holds himself out as Joe Nadel, or New York Joe. Yarin Nadel conducted and directed the fraudulent acts alleged herein while within the Eastern District of New York.

9. Defendant Michael Nadel is Yarin Nadel's father. Michael Nadel also does business as, is also known as, and holds himself out as, Michael Miller. Michael Nadel conducted and directed the fraudulent acts alleged herein while within the Eastern District of New York.

10. Defendants Yarin and Michael Nadel direct and control the Corporate Defendants and use those corporate entities to perpetrate the fraudulent scheme alleged herein. Both Yarin and Michael Nadel operate the Corporate Defendants out of offices located in Fresh Meadows, New York (the "Fresh Meadows Office"), located in the Eastern District of New York.

11. Defendant Around the Clock Moving Services Inc. ("Around the Clock Moving") is, and was at all times relevant to this action, a corporation organized and existing under the laws of the State of New York. Around the Clock Moving was registered with the New York State Department of State on or about November 4, 2015. Around the Clock Moving designated defendant Michael Nadel as its registered agent for service of process, providing a Fresh Meadows, New York address for service.[1]

12. Defendant Direct Van Line Services Inc. ("Direct Van Line") is, and was at all times relevant to this action, a corporation organized and existing under the laws of the State of New York. Direct Van Line was registered with the New York State Department of State on or about December 16, 2016.

13. Defendant State to State Moving NY Inc. ("State to State Moving NY") is, and was at all times relevant to this action, a corporation organized and existing under the laws of the State of New York. State to State Moving NY was registered with the New York Department of State on or about February 7, 2018.

---

[1] The Fresh Meadows address provided for service on Michael Nadel as Around the Clock Moving's registered agent is different than the Fresh Meadows Office address, where Yarin Nadel also resides.

14.     Defendant Moving State to State LLC ("Moving State to State") was registered with the New York State Department of State on or about April 6, 2018.

15.     Defendant State to State Moving Group LLC ("State to State Moving Group") was registered with the New York Department of State on or about October 10, 2018.

## DEFENDANTS' ONGOING FRAUDULENT SCHEMES

16.     The defendants advertise interstate moving services on the internet.

17.     When contacted by the public through the internet, or by electronic mail or telephone, defendants provide bids to move the individuals' personal property. During communications with potential customers over interstate wires, the defendants make a series of material misrepresentations designed to induce the potential customers to retain defendants. After the customers retain defendants to provide the moving services, the defendants schedule a pick up date when the defendants' agents arrive, pack up the victims' belongings and place them onto a moving truck or van. But, after all of the customers' belongings have been loaded, the defendants demand exorbitant additional sums to be paid by cash, postal money order or, in at least one instance, credit card. If the victims refuse to pay the additional amounts, instead of delivering the belongings as promised, the defendants place the items in storage until the victims pay the marked up prices. If the victims refuse to pay the additional sums, the defendants threaten to sell or auction the items. The victims are forced into a Catch-22 scenario of either paying the extortionate additional fees, being deprived of their property for months, or even potentially permanently losing their personal property.

## Representative Examples of the Fraudulent Scheme

**Customer-1**

18.     In September 2018, Cory Hammock, an individual residing in Virginia ("Customer-1") planned to move to Utah and used a moving broker to find a moving company. Through the broker, Customer-2 was put in contact with defendants, and their agent Grant Kennedy.

19.     Kennedy communicated to Customer-1 that defendants' rates for moving were based on the total weight. Kennedy also told Customer-1 that defendants had their own truck. In an August 31, 2018 email from grant@statetostateny.com, defendants misrepresented that they would move Customer-1's property for a price of $5,995.55.

20.     Defendants also misrepresented that Customer-1 would only be required to pay $3,000 at the start of the move.

21.     In reliance upon defendants' misrepresentations, including as to the price, Customer-1 retained defendants to move his property for $5,995.55.

22.     On the day of the move, defendants' agents arrived with a Budget Rental truck, not a truck owned by defendants. Before loading the vehicle, defendants' agents knowingly and intentionally failed to tell Customer-1 that (a) he would have to pay material additional sums in addition to the price previously quoted, or (b) that defendants would not deliver his property until he paid defendants the additional sums.

23.     After loading the moving truck with Customer-1's property, defendants' agents demanded that Customer-1 pay approximately an additional $1,300 in order to proceed with the move. Customer-1 refused to pay the additional amount. Thereafter, the defendants' agents placed Customer-1's property into storage. Subsequently, defendants refused to deliver Customer-1's property until the additional amounts were paid.

5

24.     In October 2018, Customer-1 filed suit against defendant Moving State to State, LLC; defendant State to State Moving NY Inc.; Mickey Miller, who in fact is defendant Michael Nadel; Joe Miller, who in fact is defendant Yarin Nadel; as well as certain another corporate entity and other individuals believed to be agents of defendants, specifically State to State Moving Group LLC; Natalie Schmid; and Does 2-6 (collectively, the "Private Suit Defendants"). *See Hammock v. Moving State to State, LLC, et al.,* 18-CV-5628 (SJ)(ST).

25.     On January 4, 2019, United States District Judge LaShann DeArcy Hall issued a temporary restraining order against the Private Suit Defendants in that action, which prohibited the Private Suit Defendants from disposing of Customer-1's property.

26.     On or about January 4, 2019, a process server served the January 4 order at the Fresh Meadows Office.   In response, the Private Suit Defendants indicated that they intended to proceed with selling Customer-1's property on January 10, 2019.

27.     On January 8, 2019, United States District Judge Sterling Johnson issued a second restraining order against the Private Suit Defendants.  On or about January 10, 2019, a process server served the January 10 order at the Fresh Meadows Office.

28.     On January 11, 2019, Customer-1's counsel filed a status report to the Court stating that the Private Suit Defendants had not complied with two successive court orders and that defendant Yarin Nadel indicated that defendants did not intend to comply with the orders.

29.     On or about February 18, 2019, the Private Suit Defendants told Customer-1's counsel, in sum and substance, that they would release Customer-1's goods if Customer-1 dropped his lawsuit.  The Private Suit Defendants told Customer-1 that they would only release Customer-1's goods if the customer paid the storage fees.

30.     On January 8, 2019, the Private Suit Defendants e-mailed Customer-1's counsel that Customer-1's property were located at storage facility in Jamaica, Queens (the "Jamaica Storage Facility").  The contract between defendants and the Jamaica Storage Facility lists the Fresh Meadows Office as the defendants' address.  The contract also states that Joe Nadel has control over the storage unit.  Joe Nadel is actually defendant Yarin Nadel.

**Customer-2**

31.     In September 2018, Angela Bynum, an individual residing in Virginia ("Customer-2") planned to move to Washington and used an online brokerage site to find a moving company.  Through the brokerage site, Customer-2 was put in contact with defendants and their agent, Gemma Collins.

32.     In an October 3, 2018 email from Gemma Collins, who held herself out as a "Relocation Specialist" for defendant Moving State to State LLC, using the email address gemma@statetostateny.com, defendants stated "The package we built still stands with the total cost of your move at $4773.60."

33.     In response to defendants' October 3, 2018 email, Customer-2 emailed a series of questions, including (a) whether defendants were a moving broker; (b) whether defendants were "locking in a certain rate" per pound; and (c) whether the price "will change again."

34.     In an October 4, 2018 email, also sent from gemma@statetostateny.com, defendants responded that they "are both a broker and a carrier," that her property would be transported "on a State to state truck," that she was "locked into" a quoted price per pound, and that defendants "never go up on the price."

35.     In a telephone call with Gemma Collins on or about October 4, 2018, Collins also told Customer-2 that (a) her property would be the only items on the moving truck; (b) State to

7

State had its own trucks; (c) delivery would occur within 10 days of pick up; and (d) Customer-2 would receive a $500 discount on interstate car shipping by booking shipping services through State to State.

36.  Customer-2 selected defendants because, although they provided the highest quote, Customer-2 believed the promised service was worth a premium.

37.  Customer-2 believed the promised service was worth a premium because State to State misrepresented that, among other things: (a) that the quoted price was "locked in" and would "never go up," (b) Customer-2's property would be the only items on the moving truck; (c) State to State had its own trucks; (d) delivery would occur within 10 days of pick up; and (e) Customer-2 would receive a $500 discount on interstate car shipping by booking shipping services through State to State.

38.  In reliance upon defendants' misrepresentations, including as to the price, Customer-2 retained defendants to move her property for $4,773.60.

39.  On the day of the move, October 13, 2018, defendants' agents arrived with a rental truck from Budget Rental, not a truck owned by defendants. Before loading the truck, defendants' agents knowingly and intentionally failed to tell Customer-2 that (a) she would have to pay material additional sums in addition to the price previously quoted, or (b) that defendants would not deliver her property until she paid defendants the additional sums.

40.  After loading the moving truck with Customer-2's property, defendants' agents demanded that Customer-2 pay an additional $3,000 in cash in order for the move to proceed. Customer-2 paid the additional, previously unquoted, amount of $3000.00.

41.     Moreover, the interstate car shipper transporting Customer-2 vehicle indicated that they had no understanding with State to State about any discount and refused to provide the $500 discount.

42.     After State to State delivered Customer-2's property, multiple items were missing.

**Customer-3**

43.     In July 2018, Brian Beauregard, an individual residing in New Hampshire ("Customer-3") was planning to move to South Carolina and used an online brokerage site to find a moving company.  Customer-3 selected a moving company named Presidential Van Lines ("PVL") because it provided the lowest quote.  The sales representative from PVL indicated that Customer-3's price would be locked in at $5,200 based on a moving weight of 13,000 pounds and that the moves would use an 18-wheeler.

44.     On the day of the move, the defendants' agents showed up instead of movers from PVL.  The defendants' agents came with a small rental truck from Penske Truck Rental and not the agreed-upon 18-wheeler truck.

45.     The defendants' agents told Customer-3, in sum and substance, that they would be moving his property.  Defendants' agents then loaded Customer 3's property on the rental truck.  But, before loading Customer-3's property, the defendants' agents knowingly and intentionally did not tell Customer-3 (a) that he would have to pay defendants material an additional amount over and above the price quoted by PVL, or (b) that defendants would not deliver Customer-3's property until he paid the material additional sums above the price quoted by PVL.  The defendants' agents knowingly and intentionally omitted to disclose these material facts in order to induce Customer-3 to allow the defendants to take custody of his property.

9

46.     After taking custody of Customer-3's property, defendants' agents told Customer-3 that his quoted price of $5,200 was no longer valid and that he now owed at least $10,000. Subsequently, Customer-3 contacted defendant Yarin Nadel, also known as Joe, regarding the higher price and Yarin Nadel stated, in sum and substance, that Customer-3 was required to pay the additional amount in cash or U.S. postal money order, or defendants would not deliver Customer-3's property.

47.     As a result of the foregoing, Customer-3 paid defendants the $10,000 unquoted fee with a money order. Defendants ultimately delivered some of Customer-3's property, albeit two weeks late. Nevertheless, multiple high-dollar items worth approximately $30,000 were missing.

### Defendants' Fraudulent Representations

48.     Defendants make a series of fraudulent misrepresentations in order to induce victims to (a) retain defendants to move their property; (b) rely upon defendants to move their property, to the exclusion of making alternate arrangements; (c) allow the defendants and their agents to take custody of their property; and (d) to make payments to defendants.

49.     Defendants' misrepresentations include, but are not limited to:

     (a)    that the quoted and agreed-upon price was accurate, and that any variances would be capped;

     (b)    that the customers' property would be the only items on the moving truck;

     (c)    that State to State had its own trucks;

     (d)    that State to State would move the customer's property in an 18-wheeler truck;

     (e)    that State to State would deliver the customer's property within an agreed-upon window, subject only to force majeure circumstances; and

     (f)    that State to State could arrange discounts on other associated services, i.e., rental cars.

50.     At the time they made the representations to the potential customers, the defendants knew that some or all of these representations were false, or were reckless as to the truth of the statements.

51.     Defendants also make misrepresentations on the date of pick up in order to induce victims to make additional payments to them.  Specifically, defendants misrepresent the weight of the goods being transported and the necessity and costs of other contingent expenses, for example, the cost for boxing a television, the cost for packing tape used to secure boxes of the victims' property.

52.     Defendants knowingly engaged with victims through interstate wires, including email and telephone.  State to State used the following email accounts to communicate with clients: info@statetostateny.com, statetostateny@gmail.com, gemma@statetostateny.com, robert@statetostateny.com, and grant@statetostateny.com.

**Defendants' Knowledge Of The Fraud**

53.     Defendants have repeatedly raised the prices for their services after picking up victims' property, overcharged the victims for services, or refused to deliver victims' property until being paid additional sums by the victims.

54.     Defendants know that they will not provide moving services for the prices communicated over the wires to potential customers.

55.     Defendants know that the actual prices and deposits required to deliver victims' services are not "capped" by the limits defendants communicate over the wires to potential customers.

11

56.     Defendants know, or are reckless as to the truth or falsity of their representations, communicated over the wires to potential customers, that the customers' property would be the only items transported on defendants' moving vehicles.

57.     Defendants know that, contrary to their representations communicated over the wires to potential customers, they do not own their own trucks.

58.     Defendants know, or are reckless as to the truth or the falsity of their representations, communicated over the wires to potential customers, that the customers' property would be delivered to the intended location on the date scheduled, subject only to *force majeure* circumstances.

59.     Defendants know that, contrary to their representations made over the wires to potential customers, they do not have a relationship with interstate car shippers entitling their customers to a $500 discount.

60.     Defendants know that victims are deceived by their representations because *inter alia* victims repeatedly complain to defendants and to the Better Business Bureau that they were deceived and misled by the defendants' misrepresentations.

61.     Although the defendants know that their representations are fraudulent, they continue to perpetrate their schemes.

### Harm to Victims

62.     Defendants' misrepresentations have harmed victims financially and by depriving the victims' of the possession and use of their personal property.

63.     Defendants store victims' personal property in storage units located *inter alia* in Jamaica, Queens.  As recently as March 7, 2019, defendants have contacted the storage facility and indicated that they intend to remove the contents of some or all of the storage units in the near

future.  Defendants have also threatened to auction off, or otherwise dispose of, victims' personal property if they do not make additional payments.  If defendants auction off, sell, or otherwise permanently dispose of the personal property of victims, the victims will be further harmed.

64.     Defendants' fraudulent schemes are ongoing.  Absent injunctive relief by this Court, defendants will continue to cause injury to recipients of these solicitations.

### FIRST CAUSE OF ACTAION

(18 U.S.C. § 1345 – Injunctive Relief)

65.     The United States realleges and incorporates by reference paragraphs 1 through 64 of this Complaint as though fully set forth herein.

66.     By reason of the conduct described herein, defendants violated, are violating and are about to violate 18 U.S.C. §§ 1343 and 1349 by executing a scheme or artifice to defraud for obtaining money or property by means of false or fraudulent representations with the intent to defraud, and, in so doing, use wire communications.

67.     Upon a showing that defendants are committing or about to commit wire fraud, the United States is entitled, under 18 U.S.C. § 1345, to a temporary restraining order, a preliminary injunction and a permanent injunction restraining all future fraudulent conduct and any other action that this Court deems just in order to prevent a continuing and substantial injury to the victims of fraud.

68.     As a result of the foregoing, defendants' conduct should be enjoined pursuant to 18 U.S.C. § 1345.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff United States of America requests of the Court the following relief:

A.      That the Court issue an order, pursuant to 18 U.S.C. § 1345, pending a hearing and

determination on the United States' application for a preliminary injunction, that

defendants, their agents, officers and employees, and all other persons and entities in

active concert or participation with them are temporarily restrained from:

      i.    committing wire fraud, as defined by 18 U.S.C. § 1343;

      ii.    selling, offering for sale, auctioning, consigning, destroying or otherwise disposing of any personal property received from customers for moving, including property stored by defendants on the premises of a third-party, without prior permission and approval from the Court;

      iii.    removing personal property originally received from customers for moving, and now stored on the premises of a third-party, from the third-party premises without prior permission and approval from the Court;

      iv.    raising the price of delivery, rate "per box," "per item," or "per pound," or the required deposit for services for any customers on the day of pickup or in the preceding 72 hours.  Notwithstanding the foregoing, the defendants may quote a rate "per box," "per item," or "per pound," and calculate the number of boxes, items, or net weight of the items transported on the day of pickup, provided they provide weight tickets documenting the weight of the truck with and without the property being transported, a bill of lading, and a receipt.

      v.    destroying, deleting, removing, or transferring any and all business, financial, accounting and other records concerning defendants' operations and the operations of any other corporate entity owned or controlled, in whole or in part, by defendants.

B.      That the Court further order, pursuant to 18 U.S.C. § 1345, that within 2 days from

defendants' receipt of the Temporary Restraining Order and Order to Show Cause,

defendants shall provide copies of the Temporary Restraining Order and Order to

Show Cause to all storage facilities with which they do business, informing them that

defendants cannot take possession of any items in storage without prior permission

and approval from the Court, and within 4 days from defendants' receipt of the

14

Temporary Restraining Order and Order to Show Cause, defendants shall provide proof of such notice to the Court and the United States, including the name and addresses of the entities and/or individuals to whom the notice was sent, how the notice was sent, and when the notice was sent.

C.      That the Court further order, pursuant to 18 U.S.C. § 1345, that within 5 business days from defendants' receipt of the Temporary Restraining Order and Order to Show Cause, defendants provide an inventory of the contents of all facilities containing the personal property of defendants' customers; that said inventory shall include:

   i.      the address of the storage facility,

   ii.     the number or identifier of any storage unit (e.g., locker #2, storage unit #112),

   iii.    the name, telephone number and e-mail address for any of defendants' customers whose personal property are stored in the storage unit,

   iv.     the number of boxes of the customer's personal property stored in the storage unit, and

   v.      the number and type of any non-boxed items belonging to defendants' customers stored in the storage unit

(e.g., ABC Storage Center, Storage Unit 112, Customer John Doe, telephone (212) 555-5555, JohnDoe@aol.com, 10 boxes, 1 couch, 2 bicycles).

D.      That the Court issue a preliminary injunction on the same basis and to the same effect.

E.      That the Court issue a permanent injunction on the same basis and to the same effect.

F.    That the Court order such other and further relief as the Court shall deem just and

proper.

Dated: March 19, 2019
       Brooklyn, New York

                                        RICHARD P. DONOGHUE
                                        United States Attorney
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201


                             By:        _____

                                        JOHN VAGELATOS
                                        Assistant U.S. Attorney
                                        Tel. (718) 254-6182
                                        Fax: (718) 254-6081
                                        John.Vagelatos@USDOJ.gov

# EXHIBIT D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>      v.<br><br>YARIN NADEL aka JOE NADEL, JOE MILLER; MICHAEL NADEL aka MICHAEL MILLER; MOVING STATE TO STATE LLC; STATE TO STATE MOVING GROUP LLC; DIRECT VAN LINES SERVICES INC.; and AROUND THE CLOCK MOVING SERVICES INC.,<br><br>          Defendants. | Civil Action No.<br>19-CV-1578 (MKB)(CLP)<br><br>**[PROPOSED] CONSENT DECREE AND FINAL JUDGMENT** |

WHEREAS, the UNITED STATES OF AMERICA commenced this action against defendants YARIN NADEL aka JOE NADEL ("Y. Nadel"), JOE MILLER, MICHAEL NADEL aka MICHAEL MILLER ("M. Nadel"); MOVING STATE TO STATE LLC, STATE TO STATE MOVING GROUP LLC, DIRECT VAN LINES SERVICES INC., and AROUND THE CLOCK MOVING SERVICES, INC., (collectively, "Defendants") by filing a Complaint in this Court a copy of which is annexed hereto as Exhibit A (the "Complaint");

WHEREAS, the Complaint states a claim for relief under the Fraud Injunction Statute, 18 U.S.C. § 1345;

WHEREAS, on March 19, 2019, this Court issued an *ex parte* Temporary Restraining Order and Order To Show Cause (the "TRO") upon a finding that (1) there was probable cause to believe that Defendants were violating and were about to violate 18 U.S.C. § 1343, and that (2) the statutory conditions for granting injunctive relief under 18 U.S.C. § 1345 had therefore been met (Dkt. No. 11);

*U.S. v. Nadel, et al.*, 19-CV-1578 (MKB)(CLP)
[Proposed] Consent Decree and Final Judgment

WHEREAS, the TRO was superseded on April 2, 2019, when this Court entered a

Consent Preliminary Injunction, *inter alia*, enjoining Defendants from committing wire fraud, as

defined by 18 U.S.C. § 1343 (Dkt. No. 17);

WHEREAS, Defendants consent to entry of this Consent Decree without any admission

or finding of liability or wrongdoing, and have agreed to this Consent Decree to avoid the delay,

uncertainty, inconvenience, and expense of protracted litigation;

WHEREAS, the United States and Defendants hereby agree that this Consent Decree

shall not be offered against Defendants in any other action, matter or proceeding brought by the

United States that arises from the allegations in the Complaint, save for any action under federal

law for violation of this Consent Decree and Final Judgment;

WHEREAS, this Consent Decree is not intended, and shall not be construed, as a waiver

of Defendants' Fifth Amendment rights against self-incrimination, or of any other defenses that

Defendants may assert in any other proceeding.  Defendants expressly reserve their Fifth

Amendment rights against self-incrimination and all other defenses in any other proceeding;

WHEREAS, the parties wish to settle this action upon the following terms without further

litigation, and Defendants agree that this Court may enter and enforce this Consent Decree

against them in the United States;

THEREFORE, pursuant to 18 U.S.C. § 1345 and the inherent power of this Court, IT IS

HEREBY ORDERED, ADJUDGED and DECREED as follows:

1.      Defendants and each and all of their directors, officers, agents, servants,

employees, successors, assigns, and attorneys, and all person or entities in active concert or

participation with any of them are permanently enjoined from:

        a.      Committing wire fraud, as defined by 18 U.S.C. § 1343;

*U.S. v. Nadel, et al.*, 19-CV-1578 (MKB)(CLP)
[Proposed] Consent Decree and Final Judgment

       b.       Raising the price of delivery, rate "per box," "per item," or "per pound," or the required deposit for services for any customers on the day of pickup or in the preceding 72 hours.  Notwithstanding the foregoing, Defendants may quote a rate "per box," "per item," or "per pound," and calculate the number of boxes, items, or net weight of the items transported on the day of pickup, provided they provide weight tickets documenting the weight of the truck with and without the property being transported, a bill of lading, and a receipt;

       c.       Destroying, deleting, removing, or transferring any and all business, financial, accounting and other records concerning Defendants' operations and the operations of any other corporate entity owned or controlled, in whole or in part, by Defendants for a period of ten years from the date of entry of this Consent Decree.

2.      The Consent Preliminary Injunction entered on April 2, 2019, is superseded by this Consent Decree, and is hereby vacated and dissolved.

3.      Defendants Y. Nadel and M. Nadel acknowledge and agree that this Consent Decree binds them in their individual capacities.

4.      Defendants understand and acknowledge that they may be subject to civil and/or criminal liability (including for contempt) upon a finding by a Court that they have violated this Consent Decree.

5.      If Defendants violate this Consent Decree and are found in civil or criminal contempt thereof, Defendants shall, in addition to other remedies, reimburse Plaintiff for its attorneys' fees, including overhead, investigational expenses, and court costs relating to such contempt proceeding.

6.      This Consent Decree shall not be modified except in writing by Plaintiff and Defendants and approved by the Court.

*U.S. v. Nadel, et al.*, 19-CV-1578 (MKB)(CLP)
[Proposed] Consent Decree and Final Judgment

7.     Plaintiff and Defendants shall each bear their own costs and attorneys' fees.

8.     The provisions of this Consent Decree are separate and severable from one another.  If any provision is stayed or determined to be invalid, the remaining provisions shall remain in full force and effect.

9.     Defendants hereby agree to waive, release, and remit any and all claims, either directly or indirectly against the United States and its agencies, employees, representatives and agents, including but not limited to the Department of Justice, the Federal Bureau of Investigation, and their employees, with respect to this action.

10.     This Consent Decree may be signed by the parties in counterparts, each of which constitutes an original and all of which constitute one and the same Consent Decree.  Signatures delivered by facsimile transmission or as .pdf attachment to emails, shall constitute acceptable binding signatures for purposes of this Consent Decree.

11.     This Court shall retain jurisdiction of this matter for purposes of enforcing or modifying this Consent Decree and for the purpose of granting such additional relief as may be necessary and appropriate.

12.     The parties, by their respective counsel, hereby consent to entry of the foregoing Consent Decree, which shall constitute a final judgment and order in this action.  The parties further stipulate and agree that the entry of the foregoing Consent Decree shall constitute full, complete, and final settlement of this action.


SO ORDERED:
s/ MKB 10/24/2019

_____
MARGO K. BRODIE
United States District Judge

*U.S. v. Nadel, et al.*, 19-CV-1578 (MKB)(CLP)
[Proposed] Consent Decree and Final Judgment

United States District Judge
Eastern District of New York

## THE UNITED STATES OF AMERICA

Dated: Brooklyn, New York      RICHARD P. DONOGHUE
      October 25, 2019         United States Attorney
                             Eastern District of New York

By: _____

                             DARA A. OLDS
                             Assistant United States Attorneys
                             271 Cadman Plaza East, 7th Floor
                             Brooklyn, New York 11201
                             (718) 254-6148
                             dara.olds@usdoj.gov

## DEFENDANTS

Dated: New York, New York      THE LAW FIRM OF DMITRIY
      October 21, 2019         SHAKHNEVICH
                             Counsel for Defendants Yarin Nadel; Michael
                             Nadel; Moving State to State LLC; State to State
                             Moving NY INC; State to State Moving Group
                             LLC; Direct Van lines Services Inc.; and Around
                             the Clock Moving Services Inc.

By: _____

                             DMITRY SHAKHNEVICH, ESQ.
                             233 Broadway, Suite 900
                             New York, NY 10279
                             (212) 913-9703
                             ds@dshaklaw.com